[Cite as *State v. Markin*, 2014-Ohio-3630.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
PICKAWAY COUNTY

STATE OF OHIO,                        :
                                      :
    Plaintiff-Appellee,              :        Case No. 13CA22
                                      :
    vs.                              :
                                      :        DECISION AND JUDGMENT
WILLIAM E. MARKIN,                    :        ENTRY
                                      :
    Defendant-Appellant.             :        **Released: 08/14/14**

_____

APPEARANCES:

Jeremiah J. Spires, Lancaster, Ohio, for Appellant.

Judy C. Wolford, Pickaway County Prosecutor, and Jayme Hartley Fountain, Assistant Pickaway County Prosecutor, Circleville, Ohio, for Appellee.

_____

McFarland, J.

{¶1} William E. Markin, (Appellant), appeals his conviction in the Pickaway County Court of Common Pleas on two counts: (Count One), possession of drugs, R.C. 2925.11(A)/(C)(1)(b), a felony of the third degree; and (Count Two), illegal manufacture of drugs or cultivation of marihuana, R.C. 2925,04(A)/(C)(3)(a), a felony of the second degree. Appellant contends the verdicts are not supported by sufficient evidence because the prosecution failed to prove essential elements as to each count. Appellant also contends the verdicts are against the manifest weight of the evidence. Having reviewed the entire record, we find any rational trier of fact

could have found the essential elements of the crime proven beyond a reasonable doubt. And, having reviewed the record, weighed the evidence and all reasonable inferences, and considered the credibility of the witnesses, we further find the greater amount of credible evidence supports the verdicts. As such, we overrule Appellant's assignments of error and affirm the judgment of the trial court.

FACTS

{¶2} William E. Markin was indicted by the Pickaway County Grand Jury on two counts: (Count One), possession of drugs, R.C. 2925.11(A)/(C)(1)(b); and, (Count Two), illegal manufacture of drugs or cultivation of marihuana, R.C. 2925.04(A)/(C) (3)(a). The charges arose from events which transpired on February 1, 2013 during a "reverse buy," raid, and search, (conducted by officers of the Circleville Police Department and the U.S. 23 Pipeline Task Force), of a trailer located on Villa Drive in Circleville, Ohio.

{¶3} Appellant was arraigned on March 27, 2013, and entered pleas of not guilty. He was allowed to sign a recognizance bond, and a previously posted bond of $25,000.00 was continued. Appellant was assigned appointed counsel.

{¶4} Appellant eventually proceeded to a jury trial on July 25, 2013. The State presented testimony from Detective Tom Royster, James Edward Mitchell, a confidential informant, co-defendants John Edler and Christy Lowery,[1] and

---

[1] At trial, Ms. Lowery indicated she preferred to be identified as "Christy Adkins."

JUDGMENT AFFIRMED.

Detective Jason Park. The State also introduced numerous photographic exhibits. Appellant testified on his own behalf. He also presented testimony from his sister, Amy Lynn Yarger, and his mother Connie Sue DePugh.

{¶5} Detective Royster testified he is employed by the Circleville Police Department and the U.S. 23 Pipeline Task Force. He prepared a search warrant for the trailer where Appellant was arrested, based on information obtained from the confidential informant, James Mitchell. Mitchell had approached Royster, asking to participate with the task force. Detective Royster, via authorization from the Pickaway County Prosecutor's Office, provided Sudafed knowing it would be used for the manufacture of methamphetamine. Mitchell was paid $200.00 for his participation. Royster testified Appellant, James Edler, Christy Lowery, and Matthew Griffin were present at the trailer the day the search warrant was executed. Mitchell had advised that Appellant would be there.

{¶6} Royster testified through the execution of the search warrant, the officers recovered various pieces of evidence, including a vented hood; finished product methamphetamine on a plate; pipes used to smoke methamphetamine; Coleman fuel; several mason jars; discarded Mountain Dew bottles; a salt container; liquid drain opener; digital scales; charred lithium batteries; packaging baggies; marihuana in an ash tray and smoking pipes; and one of the boxes of Sudafed. Royster described the layout of the trailer. When Royster first entered,

JUDGMENT AFFIRMED.

Appellant and Edler were in the back bedroom, both sitting on the bed.  Christy and Griffin were in the bathroom.

{¶7} Royster testified specimens were obtained from the mason jars and sent to the Ohio B.C.I. laboratory in Columbus, Ohio.  A lab report from B.C.I. confirmed 96.8 grams found to contain methamphetamine.  Royster also identified State's exhibits 4-47 (excluding exhibit 19), as photographs identifying items used in the manufacture of methamphetamine.   He identified the photographs as being true and accurate depictions of what he found on February 1, 2013, items found in the trailer.  Royster testified, with a few exceptions, the majority of the items were found in the bedroom where Edler and Appellant were located. On cross-examination, Royster admitted Edler was the intended target of the search warrant and investigation.

{¶8} Detective Jason Park of the Pickaway Sheriff's Office also testified he was part of the U.S. 23 Major Crime Task Force.  He testified as to his training in undercover narcotics and clandestine "labs," and as to the process for manufacturing methamphetamine.  Park testified he met with James Mitchell, set up surveillance equipment, provided Sudafed to Mitchell, and then surveyed Mitchell as he made contact at the trailer on Villa Drive.  Once the Sudafed was delivered, they maintained contact with Mitchell until a search warrant could be obtained.   Park was involved with the execution of the search warrant.  A tactical

JUDGMENT AFFIRMED.

team made actual entry and once the residence was secured, Park went in and assessed the methamphetamine lab. His job was to neutralize (make safe) the area where the items for manufacture were found. Park testified there were two stages in process: there was some methamphetamine drying on a plate and there was some still in liquid form. Park also identified various photographs of items found inside the trailer, which included a table where the methamphetamine was "cooked," with a vent for drying process; a bottle of salt; a plate with methamphetamine drying; a bottle containing methamphetamine; a mason jar containing methamphetamine; a hood vented out the wall; a glass plate with methamphetamine residue; Sudafed; vessels containing liquid fire; glass plate with funnel and measuring cup; an empty Sudafed box; lithium batteries; Coleman fuel; and glass mason jars. Park also identified these photographs as true and accurate depictions of the items found at Edler's trailer on February 1, 2013.

{¶9} James Mitchell testified he resided at the trailer on Villa Drive on February 1, 2013. He testified he approached the Circleville Police Department and spoke to Detective Royster regarding the manufacture of methamphetamine at his uncle's, John Edler's, residence.[2] Mitchell testified Edler, Appellant, and Christy Lowery were also involved. Appellant was residing there. Mitchell testified he was motivated to assist the police

---

[2] He also testified Edler is a brother to his former step-father. Mitchell's step-father and mother have since divorced. Mitchell has known Edler approximately 10 years.

JUDGMENT AFFIRMED.

because he was trying to "get clean." He signed paperwork to become a confidential informant.

{¶10} Mitchell further testified Edler and Appellant taught him how to make methamphetamine approximately 1 and ½ weeks before February 1, 2013. He identified surveillance video which showed him being prepped by the officers to go to the trailer and then entering the living room of the trailer. Mitchell testified Edler was telling him he had the wrong type of Sudafed. Mitchell testified the video was a true and accurate depiction of his first visit to the trailer under surveillance on February 1, 2013. Mitchell then testified he returned to the officers and accompanied them to Kroger to get the correct type of Sudafed. Mitchell testified he was under surveillance again, with a second surveillance video showing him at his residence being searched and set up by the officers. Then he returned to the trailer and left the Sudafed. As soon as he entered with the two boxes of Sudafed, Edler, Appellant, Lowery, and a woman named "Lainey" were cheering. Mitchell testified this video was also a true and accurate depiction of the second time he went to the trailer on February 1, 2013. Mitchell delivered the Sudafed between 1:00 and 2:00 in the afternoon. He stayed in contact with Edler the rest of the day, by text messaging him on Appellant's phone. Mitchell further testified while he was there, they were weighing marijuana. He denied seeing the actual manufacture of methamphetamine on February 1, 2013.

JUDGMENT AFFIRMED.

{¶11} The prosecution also presented the testimony of Christy Lowery. Lowery testified she met Edler through her friend Elaine Crabtree, a couple of days before Christmas Eve 2012, for the purpose of obtaining crystal methamphetamine. Appellant was present at Edler's trailer when she was there and she understood him to reside there. Lowery considered the trailer to be a "drug house." She saw methamphetamine transactions and she testified it was made in the back bedroom. She knew not to enter the back bedroom when methamphetamine was being made. Edler and Appellant were allowed in the back bedroom.

{¶12} The State also called John Edler. He testified he was arrested in connection with the events of February 1, 2013, at the trailer on Villa Drive, and he had entered a plea agreement in exchange for his testimony. He admitted he had previously been to prison for the manufacture of drugs in 2003. Edler testified as to the methamphetamine-making process. He had lived for two years in the trailer. At the time, Appellant and Christy Lowery also lived there.

{¶13} Edler testified he had been "ripped off" by someone he purchased methamphetamine from, so he studied and learned how to make it. He used Appellant's cell phone to access the internet to study. For three months prior to the arrests at the trailer, Edler and Appellant manufactured methamphetamine every other day. Edler testified Appellant crushed the Sudafed, opened the batteries, added the pseudoephedrine, and shook the bottles. Appellant manufactured with

JUDGMENT AFFIRMED.

him every time during the 2-3 month period. Edler testified they sold some of the methamphetamine and used most of it. Manufacture always took place in the back bedroom of the trailer. Edler identified photographic exhibits of the back bedroom and the items used in the manufacturing process. Edler testified he had a lot of contact with James Mitchell, who was at his trailer daily. Mitchell had observed the manufacturing process.

{¶14} Appellant took the stand and denied participating in the manufacture of methamphetamine on February 1, 2013. He testified he had been drug free for 175 days at the time of trial. Appellant specifically denied crushing pills, peeling batteries, or assisting in the process of manufacturing methamphetamine. He admitted he was aware that manufacture took place at the trailer on Villa Drive, but testified he did not leave because he had nowhere else to live. Appellant also testified his cell phone had run out of minutes on the night before February 1st and had no ability to communicate by cell phone. He denied arranging pickup of the finished product for Edler. He denied texting James Mitchell that the product was complete. On cross-examination, Appellant testified Edler, Mitchell, and Lowery were all drug users, and they were all lying. He denied ever participating in the manufacture of drugs in the past.

{¶15} Appellant also presented testimony from his sister and mother. Amy Lynn Yarger, his sister, testified she was unable to make contact with him on

JUDGMENT AFFIRMED.

February 1, 2013, because his phone was disconnected.  Appellant's mother,

Connie De Pugh also testified he had no cell service on February 1, 2013.

{¶16} The jury returned verdicts of guilty on both charges.

{¶17} Appellant was sentenced on October 2, 2013.  The trial court merged

the two counts for sentencing purposes.  The State of Ohio elected to proceed on

Count Two, the second degree felony. Appellant was ordered to serve five years of

incarceration.  He was also given a mandatory fine of $7,500.00.

{¶18} Appellant has filed a timely appeal.

{¶19} Where relevant, additional testimony of the fact witnesses is set forth

below.

ASSIGNMENTS OF ERROR

"I. EACH OF THE JUDGMENTS OF THE TRIAL COURT AS TO
BOTH COUNTS ONE AND TWO OF THE INDICTMENT WAS IN
ERROR AS NOT SUPPORTED BY SUFFICIENT EVIDENCE TO
FIND THE DEFENDANT MARKIN GUILTY OF VIOLATING
SECTION 2925.11, AGGRAVATED POSSESSION OF DRUGS, AS
CHARGED IN COUNT ONE OF THE INDICTMENT, AND NOT
SUPPORTED BY SUFFICIENT EVIDENCE TO FIND HIM
GUILTY OF ILLEGAL MANUFACTURE OF DRUGS OR
CULTIVATION OF MARIJUANA IN VIOLATION OF REVISED
CODE SECTION 2925.04 AS CHARGED IN COUNT TWO OF
THE INDICTMENT."

"II. EACH OF THE JUDGMENTS OF THE TRIAL COURT AS
TO COUNTS ONE AND TWO OF THE INDICTMENT WERE
ERROR AS AGAINST THE MANIFEST WEIGHT OF THE
EVIDENCE."

A.  STANDARD OF REVIEW-SUFFICIENCY OF THE EVIDENCE.

JUDGMENT AFFIRMED.

{¶20} When reviewing a case to determine whether the record contains sufficient evidence to support a criminal conviction, our function is "to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.  The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Smith,* 4th Dist. Highland No. 09CA29, 2010-Ohio-4507, ¶18, quoting *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492, (1991), paragraph two of the syllabus. See, also *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781 (1979).

{¶21} This test raises a question of law and does not allow the court to weigh the evidence. *Smith, supra,* at ¶19; *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).  Rather, this test "gives full play to the responsibility of the trier of fact * * * to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Smith, supra,* at ¶19; *Jackson* at 319.  Accordingly, the weight given to the evidence and the credibility of witnesses are issues for the trier of fact. *Smith, supra* at ¶19; *State v. Thomas,* 70 Ohio St.2d 79, 79-80, 434 N.E.2d 1356 (1982); *State v. De Hass,* 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

JUDGMENT AFFIRMED.

B. STANDARD OF REVIEW-MANIFEST WEIGHT OF THE EVIDENCE.

{¶22} Our function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. *State v. Williams,* 4th Dist. Ross No. 03CA2736, 2004-Ohio-1130, ¶28, citing *State v. Thompkins,* 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541. Our role is to determine whether the evidence produced at trial attains the high degree of probative force and certainty required of a criminal conviction. *State v. Hayslip,* 4th Dist. Adams No. 05CA812, 2006-Ohio-3120, ¶8, citing *State v. Getsy,* 84 Ohio St. 3d 180, 193, 702 N.E.2d 866 (1998). In order to undertake this review, we must sit as a "thirteenth juror" and review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice. *Williams, supra,* citing *Thompkins, supra*; *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1983). If we find that the fact finder clearly lost its way, we must reverse the conviction and order a new trial. *Id.* We cannot reverse a conviction where the state has presented substantial evidence so that a reasonable trier of fact could conclude that all of the essential elements of the offense were established beyond a reasonable doubt. *Williams, supra*; *Getsy, supra* at 193-194. We are also guided by the presumption that the trier of fact "is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use

JUDGMENT AFFIRMED.

these observations in weighing the credibility of proffered testimony." *Williams, supra*, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

## C. LEGAL ANALYSIS

{¶23} For ease of analysis, we will consider Appellant's assignments of error jointly. Appellant argues the prosecution's case was fatally deficient in credible evidence as to essential elements of both counts one and two. Appellant asserts the prosecution's case rested chiefly on the testimony of John Edler, who was charged and sentenced on the basis of his participation in the amphetamine manufacturing scheme, and who reached an agreement whereby he received a reduced sentence of three years. Appellant contends Edler did not testify as an eye witness to Appellant's participation in the crimes, and Appellant's mere presence at the trailer was insufficient to support his convictions.

{¶24} Appellee responds by acknowledging the State's key witness was co-defendant Edler. However, Appellee also points out the prosecution produced the testimony of James Mitchell and Christy Lowery. Appellee concludes when reviewing the testimony in its entirety, there was enough evidence to meet both a "sufficiency-of-the-evidence" standard and a "manifest-weight-of-the-evidence" standard.

JUDGMENT AFFIRMED.

{¶25} Appellant was convicted of count one, possession of drugs, a violation

of R.C. 2925.11(A)(C)(1)(b), which provides:

> "(A) No person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog.
>
> (C)  Whoever violates division (A) of this section is guilty of one of the following:
>
> (1)  If the drug involved in the violation is a compound, mixture, preparation, or substance included in schedule I or II, with the exception of marijuana, cocaine, L.S.D., heroin, hashish, and controlled substance analogs, whoever violates division (A) of this section is guilty of aggravated possession of drugs.  The penalty for the offense shall be determined as follows:
>
> (b)  If the amount of the drug involved equals or exceeds the bulk amount but is less than five times the bulk amount, aggravated possession of drugs is a felony of the third degree, and there is a presumption for a prison term for the offense."

{¶26} Appellant was also convicted of count two, illegal manufacture of

drugs-illegal cultivation of marihuana-methamphetamine offense, a violation of

R.C. 2925.04(A)(C)(3)(a), which provides:

> "(A) No person shall knowingly cultivate marijuana or knowingly manufacture or otherwise engage in any part of the production of a controlled substance.
>
> (C)(3)  If the drug involved in the violation of division (A) of this section is methamphetamine, the penalty for the violation shall be determined as follows:
>
> (a)  Except as otherwise provided in division (C)(3)(b) of this section, if the drug involved in the violation is methamphetamine, illegal manufacture of drugs is a felony of the second degree, and subject to

JUDGMENT AFFIRMED.

division (E) of this section, the court shall impose a mandatory prison term on the offender determined in accordance with this division."

**{¶27}** Both counts require the State of Ohio prove that Appellant acted "knowingly." Pursuant to R.C. 2901.22(B), the trial court instructed:

"A person acts 'knowingly,' regardless of his purpose, when he is aware that his conduct will probably cause a certain result or be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist. Stated another way, 'knowingly' means that a person is aware of the existence of the fact and that his acts will probably cause a certain result or be of a certain nature. Since you cannot look into the mind of another, knowledge is determined from all the facts and circumstances in evidence. You will determine from the facts and circumstances whether there existed at the time in the mind of the defendant an awareness of the probability that he was in possession of a controlled substance. You will also determine from these facts and circumstances whether there existed at the time in the mind of the defendant an awareness of the probability that he was manufacturing or engaging in a part of the production of methamphetamine."

**{¶28}** In the case, sub judice, the State of Ohio was also required to prove "possession." Possession of a controlled substance may be actual or constructive. *State v. Williams,* 4th Dist. Ross No. 03CA2736, 2004-Ohio-1130, ¶23. See *State v. Wolery,* 46 Ohio St.2d 316, 329, 348 N.E.2d 351(1976) (Internal citations omitted.). A person has "actual possession" of an item if the item is within his immediate physical possession. *Williams, supra*, citing *State v. Fugate,* 4th Dist.Washington No. 97CA2546, 1998 WL 729221, *7. "Constructive possession" exists when an individual is able to exercise domination and control over an item, even if the individual does not have immediate physical possession

JUDGMENT AFFIRMED.

of it. *Williams, supra*, citing *State v. Hankerson,* 70 Ohio St.2d 87, 434 N.E.2d 1362 (1982), syllabus. For constructive possession to exist, "[i]t must also be shown that the person was conscious of the presence of the object." *Williams, supra,* quoting *Hankerson,* 70 Ohio St.2d at 91, 434 N.E.2d 1362. The state may prove the existence of the various components of constructive possession of contraband by circumstantial evidence. *Williams, supra,* citing *State v. Jenks,* 61 Ohio St.3d 259, 272-273, 582 N.E.2d 552 (1991). Moreover, two or more persons may have joint constructive possession of a particular item. *Williams, supra,* citing *State v. Mann*, 93 Ohio App.3d 301, 308, 638 N.E.2d 585 (8th Dist.1993).

{¶29} A defendant's mere presence in an area where drugs are located does not conclusively establish constructive possession. *Williams, supra,* at ¶25; *State v. Cola,* 77 Ohio App.3d 448, 450, 602 N.E.2d 730 (11th Dist.1991); *Cincinnati v. McCartney,* 30 Ohio App.2d 45, 48, 281 N.E.2d 855 (1st Dist.1971). However, a defendant's proximity to drugs may constitute some evidence of constructive possession. *Williams, supra,* at 25. Mere presence in the vicinity of drugs, coupled with another factor probative of dominion or control over the contraband, may establish constructive possession. *Fugate,* at *8. Under this framework, Appellant argues he was simply present when the officers executed the warrant at the trailer on Villa Drive, but no eye-witness evidence implicates him.

{¶30} Here, the trial court also instructed:

JUDGMENT AFFIRMED.

" 'Possess' or "possession' means having control over a thing or substance that may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found."

{¶31} We must disagree with Appellant's argument as we find there was evidence such that any rational trier of fact could have found the essential elements of count one, possession of drugs, and count two, illegal manufacture of drugs, proven beyond a reasonable doubt. The jury had for its consideration, not only Appellant's presence in the trailer's back bedroom, where officers testified the precursors for manufacturing methamphetamine were found, but also the testimony of Mitchell, Edler, and Lowery. The evidence provided by Mitchell and Lowery bolsters the testimony provided by Edler and, taken in its entirety, supports the conclusion that Appellant knowingly possessed drugs and participated in the manufacture of methamphetamine on February 1, 2013.

{¶32} Mitchell testified he approached the police for the purpose of turning in Edler, Appellant, and Lowery. As to the events of February 1, 2013, Mitchell testified he delivered Sudafed to the trailer and stayed in contact with Edler through Appellant's cell phone. True, Appellant's cross-examination elicited testimony from Mitchell that he never interacted with Appellant on his two visits to the trailer on February 1, 2013, and Appellant never instructed him on the arrangements. Mitchell also admitted he did not have verification of any text messages sent to him by Appellant on the date in question.

                                                                    JUDGMENT AFFIRMED.

{¶33} Lowery testified the trailer was a "drug house." She testified "half of Circleville" stayed there at times. She saw methamphetamine transactions and she knew it was being made in the trailer's back bedroom. When she purchased methamphetamine, it was from Edler or from the Appellant. Lowery's testimony, along with Mitchell's, supports the inference that Appellant knew how to make methamphetamine and had previously done so in the trailer's back bedroom.

{¶34} However, as to the specific events of February 1, 2013, Lowery specifically testified she had been at the trailer numerous times and was waiting on methamphetamine to be made. Lowery identified the video which showed how the trailer looked on February 1, 2013. She identified people screaming and cheering on the video because Mitchell had brought the Sudafed. Lowery testified when the officers kicked the door in, she and Matt Griffin were in the bathroom and Edler and Appellant were in the bedroom. She had $40.00 in her pocket she was planning to purchase methamphetamine. Lowery's testimony directly implicates Appellant in the manufacturing activities on the date in question.

{¶35} At trial, Edler seemed to have trouble recalling events on February 1, 2013, so the prosecutor played the first video. Edler acknowledged hearing some conversation about generic Sudafed. He testified manufacture is easier with a generic version. He recalled sending Mitchell to get a different type of Sudafed.

JUDGMENT AFFIRMED.

{¶36} The prosecutor also played the second video. Edler recalled when the law enforcement officers burst in on February 1, 2013; he was in the back bedroom with Appellant, Lowery, and Matt Griffin. Edler specifically testified he and Appellant had manufactured methamphetamine on February 1, 2013. Appellant helped in the initial stages. Appellant crushed the Sudafed pills,[3] "opened the tunnel to a bottle," and peeled batteries.[4] He believed Appellant was with him during the entire manufacturing process on February 1, 2013, but there were times when Appellant would leave to clean the bathroom where they mixed the chemicals. Edler specifically testified:

> "Sometimes it would be after I would get down to where let it set 15 minutes, that's usually when he would come and clean. Other than that, he was in the room with me."

Prior to the officers' arrival, they had just completed the process. When the police arrived, Appellant was beside him on his left in the back bedroom. Lowery and Griffin were also there but ran through the door to the bathroom.

{¶37} Based upon our review of the evidence adduced at trial, we find a rational trier of fact could have found the essential elements of possession of drugs

---

[3] Edler testified as follows:

Q:      And on February 1st, who crushed the pills?
A:      I believe Will Markin.
Q:      Do you know or you believe?
A:      I believe it was. He usually did it all the time.
Q:      Did you do it that day?
A:      No.

[4] Edler testified Appellant crushed the pills, usually at the kitchen sink or on the kitchen table. He testified Appellant peeled the batteries in the bathroom.

JUDGMENT AFFIRMED.

and illegal manufacture of drugs proven beyond a reasonable doubt. Although Appellant took the stand and denied participation in these crimes, the combined testimony of Mitchell, Edler, and Lowery is strong evidence that Appellant knowingly participated in the crimes charged on February 1, 2013.

{¶38} We turn next, to analysis of the evidence under a "manifest weight" standard. We begin by noting in *State v. Hayslip,* 4th Dist. Adams No. 05CA812, 2006-Ohio-3120. Hayslip was indicted and convicted of the illegal manufacture of drugs, in violation of R.C. 2925.04. On appeal, Hayslip argued his trial counsel provided him ineffective assistance and also argued his conviction was against the manifest weight of the evidence. At Hayslip's trial, the jury heard testimony about the types of materials found in Hayslip's presence at the crime scene, and that these materials were commonly used for the manufacture of methamphetamine. The jury also heard testimony from Hayslip's co-defendant, Carter, that placed Hayslip at the scene of the crime on the day in question, that Hayslip was familiar with the scene of the crime (a shed) and had access to it, and further, that Hayslip was regularly present in the shed with another co-defendant when the shed was used to manufacture methamphetamine.

{¶39} Another co-defendant, Blythe, also testified Hayslip and he had manufactured methamphetamine in the shed before and on the day in question. The jury also heard testimony from a forensic scientist from BCI about the

JUDGMENT AFFIRMED.

manufacturing process and the ingredients and materials used. The scientist testified that several exhibits contained methamphetamine residue and that pills found in the shed contained pseudoephedrine. Upon review, we concluded that each element of R.C. 2925.04 was proven beyond a reasonable doubt and that the jury did not lose its way. We overruled Hayslip's assignment of error and affirmed the trial court's judgment.

{¶40} As in *Hayslip,* we have applied the foregoing principles and find substantial and credible evidence on all elements of the counts charged from which a reasonable jury could conclude that Appellant knowingly possessed drugs and participated in the manufacture of drugs. Although Appellant argues there was no eye-witness testimony but for the testimony of his co-defendant Edler, and that Edler's testimony is not credible, the complete testimony, set forth above, makes it clear that Appellant was being referenced in the mutual activities which occurred at the trailer on Villa Drive on February 1, 2013. Appellant was present at the trailer with the co-defendants at the time the officers arrived and found the ingredients used to manufacture methamphetamine, as well as completed product. However, other factors coupled with Appellant's presence lead us to our conclusion. The evidence at trial also demonstrated Appellant had participated in the past by crushing Sudafed and peeling batteries. Edler's testimony that Appellant participated by crushing Sudafed and peeling batteries on February 1,

JUDGMENT AFFIRMED.

2013 directly implicates Appellant. Both Edler and Lowery's testimony that Appellant was present in the room with Edler on February 1, 2013 further directly connects Appellant to the crimes charged.

{¶41} We also note in resolving conflicts of the evidence, the jury was in the best position to observe the witnesses, weigh their demeanor, and any gestures or voice inflections, and determine their credibility. The jury was instructed as to the legal definitions of direct evidence, circumstantial evidence, and credibility. The jury was instructed that as to the weight of the evidence, they were free to believe all, part or none of any witness's testimony.

{¶42} Mitchell's credibility was one issue for the jury's consideration. On cross-examination, Mitchell testified he is unemployed. He admitted he has used illegal substances in the past. He testified he was present in the room where methamphetamine was being made 1 and ½ weeks before February 1, 2013. He testified Lowery was present at that time and knew what was going on. He admitted he was present because he was going to receive methamphetamine and because he was being taught how to make it.

{¶43} Lowery's and Edler's credibility was also at issue. Lowery acknowledged she was charged in the incident and had entered a plea agreement. On cross-examination, she admitted she had previously been to prison. On cross-examination, Edler admitted he was currently in prison and had received a

JUDGMENT AFFIRMED.

substantial reduction of prison time from what he was facing, having been charged

with two felonies after the February 1, 2013 incident. He admitted

methamphetamine use since 1985.

{¶44} Importantly, the jury was instructed about the testimony of

accomplices as follows:

> "Ladies and gentlemen, you have heard the testimony from John C. Edler and Christy Lowery, other persons who have pled guilty to crimes charged from this incident and are said to be accomplices. An accomplice is one who knowingly assists or joins another in the commission of a crime. The weight to give to their respective testimony are matters for you to determine from all the facts and circumstances in evidence. The testimony of an accomplice does not become inadmissible because of his or her complicity, moral turpitude, or self interest, but the admitted or claimed complicity of a witness may affect his or her credibility and make their testimony subject to grave suspicion, and required that it be weighed with greater caution. It is for you, as jurors, in light of all the facts presented to you and from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth. An accomplice may have special motives in testifying, and you should carefully examine an accomplice's testimony and use it with great caution and view it with grave suspicion.

{¶45} The jurors were in the best position to observe Appellant and judge

his credibility. They were also in the best position to observe Edler and Lowery

and to evaluate their credibility in giving testimony against Appellant. Having

done so, we cannot say the jury clearly lost its way and created a manifest

miscarriage of justice. Accordingly, we therefore overrule both assignments of

error and affirm the judgment of the trial court.

JUDGMENT AFFIRMED.

## __JUDGMENT ENTRY__

It is ordered that the JUDGMENT BE AFFIRMED and costs be assessed to Appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Pickaway County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, P.J. & Hoover, J.: Concur in Judgment and Opinion.

For the Court,

BY: _____

Matthew W. McFarland, Judge

## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**

JUDGMENT AFFIRMED.